IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT 3 0 2015

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

ROCKY DEE HIDROGO JR.,               §
                                     §
            Petitioner,              §
                                     §
v.                                   §        No.  4:14-CV-137-A
                                     §
WILLIAM STEPHENS, Director,          §
Texas Department of Criminal         §
Justice, Correctional                §
Institutions Division,               §
                                     §
            Respondent.              §

**MEMORANDUM OPINION**
**and**
**ORDER**

     This is a petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254 filed by petitioner, Rocky Dee Hidrogo Jr., a state

prisoner currently incarcerated in the Correctional Institutions

Division of the Texas Department of Criminal Justice (TDCJ)

against William Stephens, Director of TDCJ, respondent.  After

having considered the pleadings, state court records, and relief

sought by petitioner, the court has concluded that the petition

should be denied.

### I.   Factual and Procedural History

     In October 2008 petitioner was indicted in the 220th

Judicial District Court of Comanche County, Texas, with capital

murder.  Adm. R., WR-80,475-01 writ, Indictment, ECF No. 19-4.

The Eleventh Court of Appeals of Texas summarized the evidence as

follows:

> The evidence showed that, on July 5, 2008, Eddie Ray
> Jr. and appellant committed five burglaries in the
> rural area near the victim's house.  Eddie testified at
> trial and admitted he was involved in the burglaries,
> including the burglary of the victim's house.  Eddie
> said he dropped appellant off outside the houses, left,
> and came back to pick appellant up a short while later.
> When Eddie picked appellant up from the victim's house,
> appellant had a shotgun and a .32 caliber revolver,
> which he had taken from the victim's home.  Appellant
> told Eddie that he had shot and killed a man in that
> house.  The victim was later found lying in his bed
> with a single gunshot wound to the head from a .32
> caliber bullet.  Crime scene evidence revealed that the
> victim was asleep when he was shot.  A shotgun
> identified by serial number as the victim's missing
> shotgun was recovered after Eddie led police to the
> location where Eddie had discarded it.

*Id.*, Mem. Op. 133-34.

The evidence also included witness testimony and videotape

footage placing Eddie and petitioner together after the time the

burglaries occurred at an Allsup's store, witness testimony that

Eddie and petitioner were the only two involved in the burglaries

and that Eddie and petitioner returned to the Ray's apartment

with guns on the night of the burglaries, and expert testimony

that a blood smear found on a "water filtration device" in the

victim's house was a mixture of the victim's and petitioner's

DNA.

Based on the evidence, a jury found petitioner guilty, and the trial court sentenced him to an automatic life sentence without parole. *Id.*, Judgment of Conviction by Jury 147. Petitioner appealed the judgment, but the Eleventh Court of Appeals of Texas affirmed the judgment, the Texas Court of Criminal Appeals refused his petition for discretionary review, and the United States Supreme Court denied writ of certiorari. *Hidrogo v. Texas*, 133 S. Ct. 194 (2012); *Ex parte Hidrogo*, 2013 WL 6311876 (Tex. Crim. App. Nov. 27, 2013); *Hidrogo v. Texas*, 352 S.W.3d 27 (Tex. App.–Eastland 2011). Petitioner also filed a state habeas application challenging his conviction, which was denied by the Texas Court of Criminal Appeals on the findings of the trial court. Adm. R., WR-80,475-01 writ, Action Taken Sheet, ECF No. 19-1. This federal habeas petition followed.

## II. Issues

Petitioner raises five grounds for habeas relief:

(1)   Trial counsel failed to present testimony and evidence of a witness that would have been material to the defense;

(2)   Trial counsel failed to object to the "police/agents of the state's destruction of exculpatory evidence, to-wit: text messages";

(3)   His right to due process was violated by the state's destruction of text messages that pointed to another as the killer;

3

(4)   His Sixth and Fourteenth Amendment rights were
      violated when he was denied the right to present a
      complete defense; and

(5)   His right to due process was violated by the
      state's use of junk science.

Pet. 6-7,[1] ECF No. 1.

### III.   Rule 5 Statement

Respondent believes that petitioner has sufficiently exhausted his claims in state court and that the petition is neither successive nor time-barred.   28 U.S.C. § 2244(b), (d). He does contend however that petitioner's third claim is procedurally barred.   Resp't's Answer 4, 13-14, ECF No. 20.

### IV.   Discussion

#### *Legal Standard for Granting Habeas Corpus Relief*

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless he shows that the prior adjudication:   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision

---

[1]Because one or more pages of the petition and inserts are not paginated, the pagination reflected in the ECF header is used.

that was based on an unreasonable determination of the facts in

light of the evidence presented in the state court.  28 U.S.C. §

2254(d).  A decision is contrary to clearly established federal

law if the state court arrives at a conclusion opposite to that

reached by the United States Supreme Court on a question of law

or if the state court decides a case differently than the Supreme

Court has on a set of materially indistinguishable facts.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  A state court

decision will be an unreasonable application of clearly

established federal law if it correctly identifies the applicable

rule but applies it unreasonably to the facts of the case.

*Williams*, 529 U.S. at 407-08.

The statute further requires that federal courts give great

deference to a state court's factual findings.  Section

2254(e)(1) provides that a determination of a factual issue made

by a state court shall be presumed to be correct.  The petitioner

has the burden of rebutting the presumption of correctness by

clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  When the

Texas Court of Criminal Appeals denies a federal claim in a state

habeas corpus application without written order, "it may be

presumed that the state court adjudicated the claim on the merits

in the absence of any indication or state-law procedural

5

principles to the contrary." *Johnson v. Williams,* 133 S. Ct.
1088, 1094 (2013) (quoting *Harrington v. Richter,* 562 U.S. 86,
98-99 (2011)).   With these principles in mind, the court
addresses petitioner's claims.

### *Ineffective Assistance of Counsel*

Petitioner was represented at trial by Kenneth G. Leggett
and Doyle Keith Woodley.   In his first and second grounds,
Petitioner claims counsel was ineffective by failing to call
Ryleigh LaFlame, Chastity Keele, Paige Clark or Sabrina Bernardo
to testify regarding text messages from Ryleigh LeFlame to Paige
Clark implicating Brian Ray, Eddie's brother, in the murder and
to object to the state's destruction of the text messages.

A criminal defendant has a constitutional right to the
effective assistance of counsel at trial.   U.S. CONST. amend. VI,
XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v.
Washington*, 466 U.S. 668, 688 (1984).   An ineffective assistance
claim is governed by the familiar standard set forth in
*Strickland v. Washington*.   466 U.S. at 668.   To establish
ineffective assistance of counsel a petitioner must show (1) that
counsel's performance fell below an objective standard of
reasonableness, and (2) that but for counsel's deficient
performance the result of the proceeding would have been

6

different. *Id.* at 688.

In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Where a petitioner's ineffective assistance claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the *Strickland* standard in light of the state court record. *Harrington,* 131 S. Ct. at 785 (quoting *Williams v. Taylor,* 529 U.S. at 410); *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 571 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster,* 563 131 S. Ct. 1388, 1403 (2011)).

Petitioner raised his claims in his state habeas application and, in support, produced, among other things, a purported

7

affidavit by Ryleigh LaFlame (Exhibit B) stating that Brian Ray

admitted to her that he was responsible for killing the victim.

Adm. R., WR-80,475-01 writ, 11-23, 73-74, ECF No. 19-4.   The

state responded and produced an affidavit by the state

prosecutor, Wesley Mau, in which he states:

> In preparing for trial in the case, I reviewed
> witness statements and interviewed witnesses whose
> testimony might be offered during trial.   Two
> witnesses, Samantha Bernardo and Ryleigh LeFlamme,[2]
> were identified as having potential knowledge of an
> alleged statement made by Brian Ray in which Brian Ray
> was supposed to have admitted being present or possible
> [sic] participating during the murder of Rev. Bundy.
> This information was based on text messages that Paige
> Clark, Rocky Hidrogo's niece, claimed to have received
> on her cell phone from Ryleigh LeFlamme.
>
> I was provided with reports from the Comanche
> Sheriff's Office about their investigation into the
> text messages, which included a summary of an interview
> with Ryleigh LeFlamme and a signed statement by her
> denying that she had sent texts such as the ones Paige
> Clark claimed to have received.   I have reviewed
> Applicant's Exhibit B, . . . which contains a statement
> of facts relating to the text messaging written from
> the point of view of Ryleigh LeFlamme.   Applicant's
> Exhibit B is unsigned, contains an incorrect spelling
> of Ryleigh LeFlamme's name on the signature line, and
> is completely inconsistent with the prior statements
> known to me to have been made by Ryleigh LeFlamme.   I
> am aware of no evidence or prior statements by Ryleigh
> LeFlamme which would suggest that she would testify in
> accordance with Applicant's Exhibit B, which she either
> did not or would not sign.

---

[2]There are multiple variations of Ryleigh LaFlame's name throughout the record.

On September 9, 2009, I personally spoke to
Samantha Bernardo.  She told me that Brian Ray never
told her he was involved in the murder or present at
the murder scene.  I had seen a written statement from
her that is confusing on this point, but Samantha
Bernardo told me that in her prior statements to law
enforcement she only meant to indicate that Brian had
told her about his brother Eddie being in trouble.

All of the reports and written statements to which
I referred to above, other than my personal interview
with Samantha Bernardo, were provided to Rocky
Hidrogo's defense attorney prior to trial, and to the
best of my knowledge and belief, they were aware at the
time of trial that Ryleigh LeFlamme and Samantha
Bernardo would have testified that they had never heard
Brian Ray confess to having murdered Rev. Bundy.

*Id.*, WR-80,475-01 writ, 143-44, ECF No. 19-4.

The state habeas court found there were no controverted,

previously unresolved facts material to the legality of

petitioner's confinement.  *Id.* at 145.  The application was

forwarded to the Texas Court of Criminal Appeals, which remanded

the case to the trial court to conduct an evidentiary hearing to

collect additional facts concerning petitioner's ineffective-

assistance claims.  *Id.* at cover, "Action Taken," ECF No. 19-4 &

Supp. R., Order 4, ECF No. 19-3.

Toward that end, the state habeas court directed counsel to

provide affidavits addressing petitioner's claims.  In his

affidavit, attorney Leggett responded as follows:

I was ordered by the Court of Criminal Appeals and

the trial Court to respond to Rocky's claim of
ineffective assistance of counsel relating to the
decision of myself and Keith Woodley (co-counsel for
Rocky) to not call a witness to testify at trial.

During Mr. Woodley and my investigation of the
case, we became aware of a claim made by Rocky's niece
that she had received text messages from a girl which
indicated that someone other than Rocky had been
involved in or had committed the murder for which Rocky
was on trial.  We determined that these messages had
been turned over to the Comanche County Sheriff.  We
discussed the same with the Sheriff and found that the
phone on which the messages were received had been
delivered to a Sheriff's deputy and that the messages
had ultimately been deleted.  A deputy had written down
the substance of the messages and, during trial, we
attempted to put the Sheriff's deputy's notes into
evidence.  That offer was objected to and objection
sustained.

During our investigation of the case, we had
determined further that the sender of the deleted
messages was one Ryleigh LaFlame.  Mr. Woodley and I
sent our investigator (Michael P. McNamara) out to talk
to Ms. LaFlame.  Our belief was that, based upon what
Rocky's niece had told us, that a man named Brian Ray
(a brother of Rocky's co-defendant Eddie Ray) had told
Ms. LaFlame that he (Brian) had actually committed the
murder for which Rocky was charged. . . .  Ms. LaFlame
denied that Brian (also known as BooBoo) had made the
statements set forth in the deleted text messages.

We were not completely convinced that Ms. LaFlame
had told our investigator the complete truth so we sent
him back to Ms. LaFlame on April 10, 2009.  Ms. LaFlame
was contacted but no information was offered. . . .

We sent Mr. McNamara out again in regards to Mr.
[sic] LaFlame and had him set up the meeting through Jo
Haslik (Ryleigh's mother).  That meeting occurred on
April 23, 2009. . . .

10

On April 7, 2009, Mr. McNamara spoke with Sabrina Bernardo, a person who, according to Rocky's niece (and Ms. LaFlame) was at the house when the deleted text messages were being sent. Ms. Bernardo did not hear Mr. Ray (Brian or BooBoo) say he killed the deceased. . . .

Our investigator also indicated that a man named Jason Moya was at Ryleigh's house when the deleted messages were sent and may have heard Brian BooBoo Ray inculpate himself. Mr. McNamara talked [to] Mr. Moya on May 14, 2009. Mr. Moya denied hearing Ray say he was involved in the murder. . . .

Mr. Woodley and I had Ms. LaFlame subpoenaed for trial . . . . I had hopes that she would change her story before she was called as a witness. She would never admit to the defense team that Brian Ray had said that he had killed the deceased, therefore, we could not prove Brian's alleged declaration against interest.

Since Mr. Woodley and I had made an issue out of the text messages and the jury had heard some testimony about the same (although the Judge would not allow us to put the deputy's notes of the substance of the messages into evidence), we did not call Ms. LaFlame as a witness because her denial of authoring text messages indicating Brian Ray was the killer would undermine what we had been able to get on the record about the Sheriff destroying exculpatory text messages.

If Ms. LaFlame had ever told me, Mr. Woodley, or Mr. McNamara that she had sent messages that named Brian Ray as the killer or that she had heard him say he was the killer, she would have been called as a witness to offer testimony to the jury.

*Id.,* WR-80,475-01 writ, Supp. R. 20-23, ECF No. 19-3.

Attorney Woodley responded by affidavit as follows:

As I understand the allegation, Mr. Hidrogo claims ineffective assistance of counsel relating to a

11

decision made by counsel not to call Ryleigh LaFlame as
a witness at trial.   Two people were indicted for the
murder of the retired Lutheran minister, to wit: Rocky
Dee Hidrogo, Jr., and Eddie Ray.

In preparation for trial, the Court authorized Kenneth
G. Leggett, co-counsel, and me to employ Mike McNamara,
former Deputy United States Marshal, from Waco, Texas,
as our investigator.   Mr. McNamara did a thorough job
of investigation and interviewing all potential
witness[es], including Ryleigh LaFlame.

During the investigation of the case we (Kenneth G.
Leggett and I) became aware of a claim made by Mr.
Hidrogo's niece, Paige Clark, that she had received
text messages from Ryleigh LaFlame which indicated that
someone other than Mr. Hidrogo and Eddie Ray had been
involved in, or had committed, the murder.   We learned
that the cell phone that had received the text messages
had been delivered by Paige Clark to the Chief Deputy
for the Comanche County Sheriff.   We discussed that
with the Sheriff and found that the phone on which the
messages were received had in fact been delivered to
the Chief Deputy, and that the Chief Deputy had deleted
the messages from the phone.   The Chief Deputy had
allegedly written down the substance of the messages.

Paige Clark claimed that Ryleigh LaFlame, by text
message, related that Brian Ray, who was Eddie Ray's
brother, had either committed the murder or was present
when the murder was committed.   Based on that
information, Mr. McNamara interviewed Ryleigh LaFlame
and others . . . .

Ms. LaFlame denied to Mr. McNamara that Brian Ray ever
made the statements that he had killed the decedent or
that he was present when the decedent was killed.   She
denied that she had sent text messages to Paige Clark
that Brian Ray had made the statements.   Mr. McNamara
interviewed every person who was allegedly present when
Brian Ray allegedly made the statements to Ms. LaFlame.
Every person denied that Brian Ray made the statements.

12

Therefore, we could not prove Brian Ray's alleged
declaration against penal interest through Ms. LaFlame
or any other witness.  We presented evidence about the
deleted text messages, and the jury heard some
testimony about the content of the text messages.

We did not call Ryleigh LaFlame as a witness because
she denied that Brian Ray had made the statements to
her, and she denied that she had sent text messages to
Paige Clark that Brian Ray had made the statements to
her.  Her testimony would have contradicted the
evidence the jury had heard about the Chief Deputy
destroying the text messages allegedly sent by Ryleigh
LaFlame to Paige Clark.  I do not believe that decision
shows ineffective assistance of counsel.  I believe
that decision was proper trial strategy.

I recall that Mr. Leggett and I advised Rocky Dee
Hidrogo, Jr., of Mr. McNamara's investigation, and the
result of the investigation concerning Ms. LaFlame and
other potential witnesses.

*Id.* at 5-6.

The state habeas court entered findings of fact consistent

with counsel's affidavits and the documentary record and

concluded that counsel made a reasonable investigation of the

evidence relating to the text messages and admissions by Brian

Ray; made an informed strategic decision not to call LaFlame or

others alleged to have heard Brian Ray confess involvement in the

offense because none of them admitted hearing Brian Ray make such

a statement; and made an informed strategic decision not to call

LaFlame or others to testify regarding text messages because none

would admit having sent such messages.  The application was

13

forwarded to the Texas Court of Criminal Appeals, which denied the application without written order on the findings of the trial court. *Id*. at 37-40 & "Action Taken," ECF Nos. 19-3 & 19-1, respectively.

Deferring to the state court's findings, in the absence of clear and convincing evidence in rebuttal and having independently reviewed petitioner's claims in conjunction with the record, the state courts' application of *Strickland* was not unreasonable. Petitioner's claims are conclusory with no factual or evidentiary basis, contradicted by the record,[3] or involve strategic and tactical decisions made by counsel after a thorough investigation, all of which generally do not entitle a state petitioner to federal habeas relief. *See, e.g., Strickland,* 460 U.S. at 689 (holding strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for post-conviction relief on the grounds of ineffective assistance of counsel); *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998)

---

[3]The record reflects that counsel did object and move for a dismissal based on Deputy Chris Pounds's failure to preserve the cell phone and the text messages implicating Brian Ray in the murder, but the motion was denied. Adm. R., RR 6 of 9, Def.'s Ex. 20, ECF No. 17-3. The record further reflects that counsel, on numerous occasions throughout the trial, questioned witnesses regarding the text messages, but was prevented from inquiring about the content of the messages on the state's hearsay objections. Counsel also made a bill of exception showing that Chastity Keele and Paige Clark would have testified that Ryleigh LaFlame sent text messages to Paige stating that Brian Ray admitted to being involved in the murder if the testimony had not been excluded.

("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."); *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (ineffective assistance claims "based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain").

## Due Process Violations

In his third ground, petitioner claims his right to due process was violated by Deputy Chris Pounds's bad-faith "destruction" of the text messages pointing to Brian Ray as the killer. Pet. 7, ECF No. 1. This claim was raised in petitioner's state habeas application for the first time, and the Texas Court of Criminal Appeals addressed the claim as follows:

> Applicant also raises due process challenges regarding the non-availability of the text messages fo use as evidence at trial, regarding items found in the victim's home that were excluded from evidence by the trial court, and regarding DNA evidence admitted at trial. These claims were either raised on direct appeal or should have been raised on direct appeal, so they are procedurally barred from consideration in collateral review.

*Ex parte Hidrogo,* No. WR-80,475-01, 2013 WL 6311876, at *2 (Tex. Crim. App. Nov. 27, 2013).

15

Respondent argues that the state court's application of the
procedural bar similarly bars review of the claim in this forum.
Resp't's Answer 13, ECF No. 20.  The court agrees.  The Texas
Court of Criminal Appeals has repeatedly held that claims that
could have been raised on direct appeal may not be raised in a
state habeas petition.  *Ex parte Gardner,* 959 S.W.2d 189, 199-200
(Tex. Crim. App. 1998).  Under the procedural default doctrine, a
federal court may not consider a state prisoner's federal habeas
claim when the last state court to consider the claim expressly
and unambiguously based its denial of relief on an independent
and adequate state procedural default.  *See Coleman v. Thompson*,
501 U.S. 722, 729, (1991); *Johnson v. Puckett*, 176 F.3d 809, 823
(5th Cir. 1999); *Fisher v. State*, 169 F.3d 295, 300 (5th Cir.
1999).  The state court clearly relied upon a firmly established
and regularly followed state procedural rule to deny petitioner's
claim that, in turn, represents an adequate state procedural bar
to federal habeas review.  *Ex parte Gardner*, 959 at 199.  *See
also Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989)
(holding "the Great Writ should not be used to litigate matters
which should have been raised on appeal").  Therefore, absent a
showing of cause and prejudice or a miscarriage of justice, such
showing not having been demonstrated, petitioner's third claim is

16

procedurally barred from the court's review.

In his fourth ground, petitioner claims his Sixth and Fourteenth Amendment rights were violated when he was denied the right to present a defense–*i.e.*, evidence of the victim's "secret life." Pet. 10, ECF No. 1. Specifically, he asserts that evidence excluded by the trial court that women's underwear, condoms, daisy-duke shorts, and pornographic movies were found in the victim's home, and later retrieved from a dumpster, could have led the jury to conclude the victim led a secret life and could have been killed by a jealous lover. He urges that had the jury heard about this "dark side," they might have drawn a different conclusion about the murder. *Id.* at 13. Petitioner raised this claim on direct review and the state appellate court in overruling the issue addressed it as follows:

> In the second issue, appellant argues that the trial court abused its discretion in excluding evidence concerning the victim's "involvement with women's underwear, condoms, and pornographic movies." Appellant asserts that the excluded evidence tended to show that the victim had a secret life, that something other than burglary was possibly involved, and that somebody else committed the murder. Nothing in the record suggests that the excluded evidence was relevant to the burglary or the victim's death. Neither the victim's character nor his alleged secret life was shown to be relevant to this case. The trial court did not abuse its discretion in excluding such evidence. *See* TEX. R. EVID. 401, 402, 404(a). Moreover, the trial court permitted appellant to introduce evidence that

the victim was clad only in pink panties at the time of
his death, and even though the trial court had ruled
that the other evidence was not admissible, Texas
Ranger Jess Ramos subsequently testified in the jury's
presence that he collected condoms and "porn"
videotapes from the victim's house.

Hidrogo v. State, 352 S.W.3d 27, 30 31 (Tex. App. 2011).

"A state court's evidentiary rulings present cognizable
habeas claims only if they run afoul of a specific constitutional
right or render the petitioner's trial fundamentally unfair."
*Johnson v. Puckett,* 176 F.3d 809, 820 (5th Cir. 1999) (citing
*Cupit v. Whitley,* 28 F.3d 532, 536 (5th Cir. 1994)). "The
failure to admit evidence amounts to a due process violation only
when the omitted evidence is a crucial, critical, highly
significant factor in the context of the entire trial." *Id.* at
821 *(citing Thomas v. Lynaugh,* 812 F.2d 225, 230 (5th Cir. 1987).
This court agrees that evidence of the victim's sexual
proclivities or sexual preference is irrelevant to the
circumstances of his murder. Accordingly, it cannot be said the
exclusion of the evidence had a substantial and injurious effect
or influence on the jury's verdict.

Finally, in his fifth ground, petitioner claims his right to
due process was violated by the state's use of "junk science."
Pet. 14, ECF No. 1. According to petitioner, over his objection

18

at trial, the state was allowed to present DNA evidence that did
not meet the reliability test because it was based on an unproven
science-a "minifiler" kit.  *Id*.  The state appellate court in
overruling the claim addressed it as follows:

>       In his final issue, appellant argues that the
> trial court abused its discretion in admitting DNA
> evidence that was not shown to be sufficiently
> reliable.  We disagree.  In its position as the
> gatekeeper of scientific evidence, the trial court has
> discretion in determining the relevance and reliability
> of expert testimony.  When the subject of the expert's
> testimony is "hard" scientific knowledge, the basis of
> that testimony must be grounded in accepted methods and
> procedures of science and meet three criteria: (1) the
> underlying scientific theory must be valid; (2) the
> technique applying the theory must be valid; and (3)
> the technique must have been properly applied on the
> occasion in question.
>
>       The record shows that the trial court conducted a
> hearing outside the jury's presence to determine the
> admissibility of the testimony of the State's DNA
> expert, Brent Wayne Watson.  At the hearing, Watson,
> who is a forensic scientist in the DNA unit of the
> Texas Department of Public Safety crime lab in Waco,
> testified regarding his qualifications and experience
> in analyzing DNA evidence.  Watson testified that he
> used the STR technique for DNA analysis, that the STR
> technique was recognized as scientifically valid by an
> overwhelming majority in that field, that he ran two
> tests in this case using commercial kits based upon the
> STR technique, and that all procedures and protocols
> were followed in this case.  Watson testified that the
> kits have been validated by the DPS for use in all
> types of DNA samples, including samples like the one in
> the present case where there is a low quantity of DNA
> present in the sample.  According to Watson, the DNA
> analysis in this case met the threshold required for
> validation.  At the conclusion of the hearing, the

trial court ruled that Watson's testimony would be permitted.[1]  We find no abuse of discretion in this ruling because the State met its burden . . . .

> [1]Watson subsequently testified that the DNA sample in question was obtained from a blood smear on a water filtration unit that was inside the bathroom where the perpetrator had apparently entered the house through a window. The results of Watson's tests revealed that the probability of someone other than appellant being the contributor of the DNA was one in 825.8 million Caucasians, one in 10.35 billion Blacks, and one in 15.52 billion Hispanics.

Mem. Op. 4-5, ECF No. 14-6. *Hidrogo v. State,* 352 S.W.3d 27, 32 (Tex. App.–Eastland Aug. 24, 2011, pet. ref'd) (citations omitted).

As previously noted, "[a] state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair." *Johnson,* 176 F.3d at 820.  Petitioner has failed to identify any legal basis for excluding Watson's trial testimony as a matter of federal-constitutional due process or to present clear and convincing evidence that the DNA results were inaccurate.  On the contrary, petitioner's own DNA expert admitted that Watson's testimony could have been accurate.

For the reasons discussed herein,

The court ORDERS that the petition of petitioner for a writ

20

of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby,

denied.  For the reasons discussed herein, the court further

ORDERS that a certificate of appealability be, and is hereby,

denied.

SIGNED October _30_ , 2015.

_____
JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE

21